# EXHIBIT B

Kilbourne Deposition
2024.12.13

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

- - -

BUFFALO SEAFOOD HOUSE, LLC, :
et al., :
                            :     CIVIL ACTION NO.:
          Plaintiffs,       :
                            :     7:22-cv-1242-RMG
                            :
          vs.               :
                            :
REPUBLIC SERVICES, INC.,    :
et al.,                     :
                            :
          Defendants.       :
_____

A+ AUTO SERVICE, LLC,       :
                            :     CIVIL ACTION NO.:
          Plaintiff,        :
                            :     2:21-cv-01492-RMG
          vs.               :        VOL. II
                            :
REPUBLIC SERVICES OF        :
SOUTH CAROLINA, LLC,        :
                            :
          Defendant.        :
_____

CONTINUING DEPOSITION OF PATRICK KILBOURNE
_____


DATE TAKEN:       December 13, 2024

TIME BEGAN:       11:30 a.m.(EST)

TIME ENDED:       2:35 p.m. (EST)

LOCATION:         (Via Videoconference)

REPORTED BY:      Tami I. Watters, RPR, CRR
                  EveryWord, Inc.
                  P.O. Box 1459
                  Columbia, South Carolina  29202
                  (803) 212-0012

1    Q    Correct.  Okay.  Section VI, same

2    questions.  I do note that it looks like

3    footnote 32 is new --

4    A    Yes.

5    Q    -- I will ask you about.  And then -- but

6    it looks like the first three paragraphs, other

7    than footnote 32, so 34, 35, and 36 look

8    essentially substantively the same to me.

9         Do you see any changes in those besides

10   footnote 32 which we'll talk about in a minute?

11   A    I agree with that.



13     A    Yes.

14     Q    And was that produced to us?

15     A    You said did I review them to see if we

16  could, and we did.  We didn't do it.

17     Q    I was asking a slightly different

18  question.  Let me reask it.  It was probably a bad

19  question.

2      A     So part of your -- so let me answer it

3  with a longer answer.

4           We looked at those two datasets to see

5  that we could.  We did not do that analysis.

6      Q     How did you determine you could do it

7  without actually trying it to see if it works?

19      Q     You did it manually.  You didn't do it

20  through any type of a computer code?

21                MR. PRICE:  Object to the form.

22                THE WITNESS:  We looked at it

23     manually to see that we could do it.

24  BY MS. ANDRESEN:

25      Q     But you didn't actually take the steps to

1   try to do it through any type of a code?

2       A    Correct, because there's no -- we don't

3   need to at this point unless it's necessary.

4       Q    But you didn't even try it just to make

5   sure that it was feasible, but it's something that

6   could be written into the code to be done?

7                   MR. PRICE:  Object to the form.

8                   THE WITNESS:  I know it's feasible.

9   BY MS. ANDRESEN:

10      Q    And that's based upon your manual review

11  of the two documents?

12                  MR. PRICE:  Object to the form.

13                  THE WITNESS:  By looking at the two

14          documents, it's obvious and clear that it's

15          feasible.

16  BY MS. ANDRESEN:

17      Q    Okay.  So let's scroll down to

18  paragraph 37.

19              Explain to me what you did in order to

20  create the information that you have here in

21  paragraph 37.

Patrick Kilbourne - Vol. 2

1  best showing them the most similar or the worst

2  showing, the one that showed the most

3  differentiation, or your testimony is it was -- you

4  believe it was representative of what it looked

5  like in the other years?

6      A    Yeah.  I don't recall that it was bigger

7  or smaller.  It's representative.

8      Q    Okay.  So let's look now at paragraph 39,

9  the Allowed Price Increases section, paragraph VII

10  of your report.  And I believe the last time I took

11  your deposition, we talked about whether or not you

12  did any calculations to determine the specific cost

13  categories in this rate adjustment provision, and

14  you said that you did not.

15          Is that still correct for your analysis

16  in this report?

17      A    So we did the same calculation, and I

18  think that's probably still accurate because --

19  largely because Republic has not identified what

20  specific costs go into each one of these

21  categories.

22          And so, you know, if Republic were to say

23  in category -- you know, for the disposal class,

24  for example, these are the specific line items that

25  go into there, which they kind of did, but then

Patrick Kilbourne - Vol. 2

1  they also said, but it, you know, varies and we

2  don't -- we aren't always sure.

3       So as a consequence, we looked at all of

4  the operating costs.  Not just the operating costs

5  that would perhaps be captured here but all of

6  them.

7       Q    So you included every single operating

8  cost.

9       A    All operating costs, yes.

10      Q    And my understanding is that in this

11  report, you looked at all operating costs for

12  commercial and industrial customers but not

13  operating costs for any other line of business

14  within Republic Services of South Carolina; is that

15  correct?

16      A    Yes.

17      Q    And it was not something that you did in

18  your initial analysis when you were looking at

19  RSI's 10-K; is that correct?

20           MR. PRICE:  Object to the form.

21           THE WITNESS:  That's correct.

22      Because Republic had not provided operating

23      costs for industrial and commercial customers

24      specifically.

25

Patrick Kilbourne - Vol. 2

1  overall analysis than you did the first time in

2  your first report?

3      A    There's nothing different related to this

4  for the rate analysis, no.

5      Q    Okay.

6      A    Other than limiting it to South Carolina.

7      Q    Correct.  Did you change in any way the

8  way that you calculated or analyzed increases in

9  CPI from your first report to this report?

10      A    No.

11      Q    And in your first report, you used a CAGR

12  analysis of a 10-year period from 2012 through

13  2021, and it's my understanding in this report you

14  have done a CAGR analysis of 2018 through 2021.

15          Can you explain to me why you chose to do

16  a different time period for this particular round?

17      A    Yeah.  Republic had only provided data

18  for South Carolina for industrial and commercial

19  customers from '18 to '21, so we were limited to

20  just using that period.

21      Q    And when you conducted the CAGR analysis

22  for RSI, you did it without looking at commercial

23  and industrial customers and for a broader period

24  of time, correct?

25      A    Well, we didn't have costs for only



9      A     Well, partially because there was some

10   criticism from Republic's expert that it shouldn't

11   be limited to just industrial and commercial

12   customers.  And so we included the overall cost

13   analysis, but we also wanted to show what it would

14   look like just for industrial and commercial.

15          Now, ideally, the more granular you can

16   get, the better.  If you could get what the cost

17   increase was for each customer, which is obviously

18   not realistic for Republic to do that, but if you

19   can get that, that would be the very best

20   information.

21          So it just kind of depends on what group

22   you're looking at.  And if we can get just costs

23   for just industrial and commercial, which Republic

24   provided this time, then we want to use that data.

25      Q     You would agree that the more granular

Patrick Kilbourne - Vol. 2

1    extremes.  There's RSI consolidated financials for

2    the entire company all lines of business.  Then

3    there is the individual customer-by-customer data

4    which does not exist.

5            Would you agree with me, though, that

6    looking as close to that customer as you could get

7    would be preferable?

8            So, for example, a customer who receives

9    services from the Greenville division in

10   South Carolina, using that division's financials

11   for that line of business, that type of granularity

12   would be best?

13                MR. PRICE:  Object to the form.

14                THE WITNESS:  I don't entirely agree

15       with that because they're both reliable.

16       And -- as we've seen with some of Republic's

17       data, once you get down into the more granular

18       data, there's changes between the divisions.

19                So if you try to get granular

20       again --

21                Again, ideally, in a perfect world,

22       if we had costs for a customer, then I would

23       love that.  But since we don't have that, we

24       have to kind of go back out wider.  And what

25       we've seen is there are some changes in the

1     data, and so looking at what the most granular

2     is may not always be the most accurate.

3   BY MS. ANDRESEN:

4     Q    So you're saying looking at the most

5   granular may not be the most accurate.

6     A    May not, because there are changes in the

7   way Republic presents the data.

8     Q    I thought you previously said that the

9   more granular you can get, the better.

10    A    No.  I mean, in a conceptual world,

11  that's true.  Again, if we can get down to the cost

12  for a specific customer, which is the most

13  granular, that would be ideal.  But what I'm

14  saying, in a practical world where Republic has

15  changes or inconsistencies in some of their

16  presentation data, if you get more granular, you

17  may not get more accuracy.

18    Q    So what level of granularity do you think

19  is optimal to do this analysis?

20    A    I don't think there's an optimal.  I

21  think there are multiple levels of granularity that

22  are reasonable.

23    Q    Well, here, your first opinion reached a

24  different result for South Carolina than your

25  second opinion, so which one is more accurate?

1           MR. PRICE:  Object to the form.

2               THE WITNESS:  Well, in my first

3       opinion I was looking at five states as a

4       sample or a surrogate for the whole country,

5       and my second report I'm looking at just

6       South Carolina.  So clearly, I'm gonna use

7       different data for those two sets.

8   BY MS. ANDRESEN:

9       Q    But in your first opinion, you were still

10  opining on damages for a South Carolina set of

11  customers, correct?

12              MR. PRICE:  Object to the form.

13              THE WITNESS:  Along with other

14      states and -- as surrogates for a national

15      analysis.

16  BY MS. ANDRESEN:

17      Q    But your testimony about the damages that

18  were sustained by South Carolina customers have now

19  changed.

20              MR. PRICE:  Object to the form.

21  BY MS. ANDRESEN:

22      Q    You're now finding less damages for those

23  same South Carolina customers that you found in

24  your first opinion.

25              MR. PRICE:  Object to the form.

```
 1   BY MS. ANDRESEN:

 2        Q    You would agree with me those numbers are

 3   different now.  What you determined to be damages

 4   in your first report for South Carolina customers

 5   is now different than the opinion you're offering

 6   in the second report.

 7        A    Yes.

 8        Q    Okay.  Which one do you think is more

 9   accurate?

10        A    If we're -- so in this report, we're

11   looking at just South Carolina.  So I would prefer

12   to use South Carolina-specific data.

13             In the previous report, we were looking

14   at five states representing the nation, and I would

15   prefer to use national data for that.

16        Q    Okay.  You have South Carolina data

17   available to you when you created the first report.

18             Why didn't you use the same

19   South Carolina data when you were estimating the

20   damages for the South Carolina customers?

21        A    Because then you would have had

22   inconsistency --

23                  MR. PRICE:  Object to the form.

24                  THE WITNESS:  Sorry Oscar.

25                  MR. PRICE:  Go ahead.  Object to the
```

█████████████████████████████████

████████

3      Q    But you would agree with me, though, that

4  your program wouldn't take into consideration

5  whether or not the customer consented to the rates

6  going up after one year in the amount that they

7  originally -- eventually went up, that 250 to --

8                MR. PRICE:  Object to the form.

9                THE WITNESS:  Well, I feel like

10       you're mixing things up.  I don't have any

11       opinions about customer consent, ████████████

█████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████

█████████████████████████████████

████████████████████████████████

██████████████████████████████████

████████████████████████████████

███████████████████

21                That's --

22  BY MS. ANDRESEN:

23      Q    That's not what I'm saying.  Let me make

24  my question clearer.

25                In my example, the contract rate is 300.

Patrick Kilbourne - Vol. 2

1    and returning to original contract rates, and

2    that's not the same thing.  You can't have both of

3    those.

4            I mean, if you say their rate is going to

5    revert to their contractual rate, ████████████████

     ████████████████████████████████████████████

     ████████████████████████████████████████████

8        Q    I'm not saying there was an agreement to

9    revert it to their contract rate.

10       A    That's what you said.

11       Q    Okay.  Well, let me ask the question

12   differently, then, if that's the way -- if I

13   mistakenly asked it that way.

7        MS. ANDRESEN:  Yes.

8        MR. PRICE:  Okay.  If you have a

9    specific -- but, I mean -- I'm having a hard

10   time following this.  If you have a specific

11   customer with --

12        MS. ANDRESEN:  Hold on, Oscar.  I

13   just want to make sure we don't have speaking

14   objections and we're not doing anything to try

15   and guide the witness here, so I just want to

16   make sure we're not --

17        MR. PRICE:  The witness -- I'm just

18   trying to help the record.  This witness

19   obviously needs no guidance.

20        MS. ANDRESEN:  I'm going to object

21   to any speaking objections, Oscar.  I know

22   Judge Gergel is very clear about speaking

23   objections during depositions.  I want to make

24   sure we don't violate any of that.

25        MR. PRICE:  I'm having a hard time

1    knowing when to object because I'm not

2    following the hypothetical at all.  So all I'm

3    saying is if you have an actual customer where

4    we can look at the ███████  look at the data,

5    look at the price increases, then let's talk

6    about it.

7              MS. ANDRESEN:  It's a hypothetical.

8              MR. PRICE:  Well, if it doesn't

9    exist, then why are we talking about it?

10             MS. ANDRESEN:  Because it's his

11   opinion.  He's an expert.  I'm allowed to ask

12   him hypotheticals and ask him his opinion.

13             I'm trying to understand ███████

█    ████████████  and without going through

15   thousands of pages of output, I'm trying to

16   find out if this is his intent.

17             MR. PRICE:  Well, I know you and he

18   are smarter than me.  I'm having a very hard

19   time following this hypothetical.

20             MS. ANDRESEN:  I understand.  If you

21   could stop the speaking objections.  If you

22   have an objection, please state an objection.

23   If not, I'll let Mr. Kilbourne tell me if he

24   doesn't understand me, and I'll clarify based

25   on his understanding of the question, please.

1              MR. PRICE:  Okay.

2    BY MS. ANDRESEN:

3        Q    Mr. Kilbourne, do you understand my

4    question?

5    [redacted]

6    [redacted]

7    [redacted]

8    [redacted]

9    [redacted]

10   [redacted]

11   [redacted]

12   [redacted]

13              MR. PRICE:  We've been going for an

14   hour and a half --

15              MS. ANDRESEN:  Okay.  If we want to

16   take a break, it's a great time to break.

17              MR. PRICE:  Yeah.  Let's take 10

18   minutes.

19                   - - -

20       (Whereupon there was a recess in the

21   proceedings from 12:49 to 1L07.)

22                   - - -

23   BY MS. ANDRESEN:

24       Q    So, Mr. Kilbourne, I would like to go

25   back to paragraph 51 of your report where we were

Patrick Kilbourne - Vol. 2

1     Q     And how do you know that that's not the

2     normal way that Republic does that?

3     A     Because we see the credits in the first

4     example I gave you of the $125 credit, that happens

5     all the time -- or not all the time, but it happens

6     much more commonly, whereas what we're discussing

7     here happens occasionally.

8     Q     Did you see differences in the states on

9     the way that they handled credits and reversals in

10    your data review?

11    A     I did not.

23              Why is it that you made that assumption?

24    A     Well, it's the -- I mean, I don't know,

25    but if I don't make that assumption, then the cost

1    increase drops dramatically; ███████████████

██  ████████████████

3         So I don't know if it was an acquisition

4    or just some sort of reorganization, but to have a

5    lower damages figure effectively, I've assumed it's

6    a reorganization.

7         Q    So if that was in fact an acquisition of

8    customers, would that change your analysis?

██    ██  ██████████████████

██  ██████████████████████████

██  ██████████████████████████

██  ██████████████████████████

██  ████████████████████████

14        Q    And if those customers were acquired,

15   would you want to exclude them from your

16   identification of potential class members based

17   upon your characteristics of trying to remove

18   customers that were acquired?

19        A    If they're acquired, yes.

20        Q    And you believe that there is a code in

21   the database that would identify whether or not

22   customers are acquired, correct?

23        A    Yes.

24        Q    Did you look at that for this particular

25   division during that time period to see if the

1    A    I don't remember.

2    Q    More than 20 hours?

3    A    I'm sure it's more than 20 hours, yes.

4    Q    More than 50 hours?

5    A    Probably more than 50.  You know, I don't

6    know.  I'm sure it's more than 50.

7    Q    Okay.  We are gonna go back to --

8                MS. ANDRESEN:  Did I ask for that to

9        be marked as an exhibit, that last

10        declaration?

11               COURT REPORTER:  No.

12               MS. ANDRESEN:  Okay.  I'd like for

13        that to be marked as Exhibit 3, please.

14                            - - -

15        (Declaration of Patrick Kilbourne marked

16        Kilbourne Exhibit Number 3, for

17        identification.)

18                            - - -

19    BY MS. ANDRESEN:

20    Q    So we're gonna move back to Exhibit 1,

21    your report.  So let's -- we were on paragraph 51.

22    Then we went back, so -- okay.

23               Let's look at the fuel and environmental

24    recoveries fee piece of your analysis.

25               I believe the last time I took your

Patrick Kilbourne - Vol. 2

1    deposition, you testified that for the fuel and

2    environmental recovery fees, you essentially

3    calculated 100 percent of the fuel and

4    environmental recovery fees that were paid by

5    customers that also paid price increases that you

6    believed exceeded the allowable amount; is that

7    correct?

8         A    Yes.

9         Q    And is that the same process you used for

10   this report?

11        A    Yes.

12        Q    So if a customer paid a price increase

13   but had negotiated to pay a flat -- let's call it a

14   flat 10 percent fuel recovery fee, you would still

15   calculate that full fee as damages for that

████  ████████████████████████████████████████

████       █  █████████████████████████████████████

████  ██████████████████████████████████████████

████       █  ███████████████████████████████████████

████  ██████████████████████████████████████████████

21        A    Yes.

22             MR. PRICE:  Object to the form.

23             THE WITNESS:  Well, one -- I mean,

24   two answers:  One, that's what counsel asked

25   me to do; and 2, from an economic perspective,

Patrick Kilbourne - Vol. 2

1    the page for commercial and industrial.

2         Q    Okay.  And so that was a manual

3    calculation that your team did?  That wasn't done

4    through any type of formula in your Excel

5    spreadsheet?

6         A    Well, I'm not sure -- I expect the way

7    they got to it was they did some sort of -- the

8    documents came in PDF or TIF or some other version,

9    and so importing those into a sheet and then adding

10   up the commercial and the industrial piece.

11        Q    So would there be another document that

12   would have the calculations?  Because we can't find

13   that we received the calculations to see

14   specifically how these numbers were achieved.

15        A    I mean, if you want to go to the source

16   document, I think we can probably -- I can show it

17   to you.

18        Q    Okay.  Let's do that.  But before we do

19   that, I just want to find out if there's something

20   we were missing; if there's some other pages that

21   have calculations that would have gone into 8.2 in

22   your possession and if you'd be willing to share

23   that with us or if there's an Excel that has

24   formulas with it.

25        A    I'm not really sure is the short answer.

Patrick Kilbourne - Vol. 2

1  If there is another Excel sheet, it would be

2  something that has disposal for commercial and

3  industrial as opposed to just the two numbers being

4  added together right here.  So I'm really not sure

5  if there is an Excel sheet or not.

6        Q    Is that something you'd be willing to

7  talk to your counsel about and, if it was

8  available, perhaps provide that to Oscar and he

9  could provide it to us?

10       A    Yeah.  If we have something, I'm happy to

11 provide it.  What it's going to look like is

12 basically this same document.

13            If it exists -- first of all, if it

14 exists, it's going to look like this same document

15 but it's going to have commercial and industrial,

16 ███████████████████████████████████████████

17       Q    Okay.  You said let's go to the source

18 document.  So let's --

■ ████████████████████████████████████

■ ████████████████████████████████████

■ ████████████████████

4     A     Do you want to -- just to make this a

5  little bit easier, Meridyth, if you want to choose

6  one -- I'm just opening the source documents, and

7  if we start with Columbia, it's at the very start,

8  so that would be easier to find as opposed to

9  scrolling through 300 pages to find the --

10          Which one was it?  Lee County.

11     Q     Lee County?  Okay.  We can start with --

12  I mean, I promise, I'm not gonna make you go

13  through every one of these, but I might need to

14  make you do a couple examples for me to make sure I

15  get it.  But, yeah, we can start with Columbia.

16          So let's go back to exhibit -- I will

17  share this again so we have -- we'll go back to

18  Exhibit 4 which is attachment 8.2.

19          So you said Columbia --

20     A     Yeah.  So it's the -- yep, Columbia.

21     Q     What year?  Columbia what year?

22     A     Let's do 2018, only because it's going to

23  be the first one and easiest one to find in the

24  source documents.

■     ■     ██████████████████████████



15          MS. ANDRESEN:  Can y'all see my

16     highlighting when I highlight like that?

17          MR. PRICE:  We can.

18          THE WITNESS:  And you need to scroll

19     to the right all the way to get the total for

20     the year, which is --

21 BY MS. ANDRESEN:

22     Q     The second number?

6     Q     Uh-huh.

7     A     And then the disposal number again.  Go

8     up a little -- right there, yeah.

9     Q     Total disposal --

16     A     Yeah.

17     Q     Okay.  I thought that was the way it was

18     being calculated but it doesn't quite seem to match

19     up like that.

24     A     Yeah.  Just -- I'm trying to find

25     Lee County in the source document.

Patrick Kilbourne - Vol. 2

```
1        Q    For 2018?

2        A    Yeah.

██    ██    ████████████████████████████

██    ████████████████████████

██    ██    ██████████████████████

██    ████████████████

██    ██    ██████████████████████

██    ████████████████████

██    ██    ███████████████████████

██    ████████████

11        Q    So is that a mathematical error or is

12   there something else that was included or excluded

13   there?

14        A    Yeah.  You know, I'll have to take a look

15   at that, because I don't know.

██    ██    ████████████████████████████

██    ████████████████████████████████

██    ████████████████████████████████

██    ████

20        A    Yes.  Yes.  So I'll have to -- I'll have

21   to take a look at that and see if --

22             Because that doesn't look right to me.

23   That looks like we have an error on that.

24        Q    Okay.  Another reason that it would

25   really help if we had those applications.
```

1                    CERTIFICATE OF REPORTER

2              I, Tami I. Watters, Registered
   Professional Reporter and Notary Public for the
3  State of South Carolina at Large, do hereby
   certify:

4

5              That the foregoing deposition was taken
   before me on the date and at the time and location
   stated on page 1 of this transcript; that the
6  deponent was duly sworn to testify to the truth,
   the whole truth and nothing but the truth; that the
7  testimony of the deponent and all objections made
   at the time of the examination were recorded
8  stenographically by me and were thereafter
   transcribed; that the foregoing deposition as typed
9  is a true, accurate and complete record of the
   testimony of the deponent and of all objections
10 made at the time of the examination to the best of
   my ability.

11

12             I further certify that I am neither
   related to nor counsel for any party to the cause
   pending or interested in the events thereof.
13 Witness my hand, I have hereunto affixed my
   official seal this 13th day of December, 2024, at
14 Lexington, Lexington County, South Carolina.

15

16

17                    Tami I. Watters,
                      Registered Professional Reporter
18                    Notary Public
                      State of South Carolina at Large
19                    My Commission expires:
                      February 11, 2029

20

21

22

23

24

25